UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL CRUZ,

               Plaintiff,

    -against-

THE CITY OF NEW YORK; New York City Department
of Correction ("DOC") Commissioner JOSEPH PONTE;
DOC Chief of Department WILLIAM P. CLEMONS;
Former DOC Deputy Commissioner of Investigations
Division FLORENCE FINKLE; Warden TURHAN
GUMUSDERE; Captain "JOHN" WILLIAMS;
Correction Officer "JOHN" MILLER; Correction Officer
"JOHN" SMITH; and Correction Officers JOHN DOE
#1-2,

               Defendants.

**COMPLAINT AND JURY
TRIAL DEMAND**

       Plaintiff Michael Cruz, by and through his attorneys Emery Celli Brinckerhoff &

Abady LLP and The Legal Aid Society, for his Complaint alleges as follows:

## PRELIMINARY STATEMENT

       1.     Plaintiff Michael Cruz was so viciously beaten by correction officers at

Rikers Island that he suffered massive internal bleeding that required the surgical removal of his

spleen. For days, correction officers ignored his complaints of pain, until finally agreeing to test

his blood—at which point they discovered massive internal bleeding. Had Mr. Cruz's condition

been ignored for even just a few more days, he likely would have died.

       2.     The events giving rise to this lawsuit occurred on June 20, 2014, when

multiple correction officers led Mr. Cruz to a secluded area in the jail without any surveillance

cameras and brutally assaulted him, without provocation. The beating left Mr. Cruz with a

fractured rib and internal bleeding. In the weeks following the assault, Mr. Cruz complained

repeatedly to Department of Correction ("DOC" or the "Department") staff that he felt severe

pain in his abdomen and that there was blood in his urine. DOC staff ignored him, or told him

that his pain was a result of the broken rib and that his feelings of internal bleeding were

imaginary. Only after desperate pleas for treatment did the clinic staff finally test his blood and

discover massive internal injuries. Mr. Cruz was rushed to the hospital; within a few hours, he

was in the operating room undergoing emergency surgery to remove his spleen and drain three

liters of blood from his stomach.

   3. The beating that caused Mr. Cruz's injuries was premeditated. The officers

deliberately took Mr. Cruz to a secluded area of the jail with no cameras, where the captain

intentionally left Mr. Cruz alone with an officer known to be a "ticking time bomb."

   4. This brutal assault is yet another example of the endemic violence and

excessive force that has plagued Rikers Island for decades—violence that Rikers Island officials

have failed to remediate, despite widespread knowledge of these problems. Indeed, just weeks

after Mr. Cruz was forced to undergo emergency surgery, the United States Department of

Justice issued a report decrying the "deep-seated culture of violence" at Rikers Island.

   5. This civil rights complaint, arising from these outrageous and unlawful

acts by DOC officers and officials, seeks compensatory and punitive damages, costs, and

attorneys' fees pursuant to applicable state and federal civil rights law.

## JURISDICTION AND VENUE

   6. This action arises under the Fourth and Fourteenth Amendments to the

United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

7.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 1367(a). This Court has supplemental jurisdiction over the New York State claims pursuant to 28 U.S.C. § 1367.

8.      The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

### JURY DEMAND

9.      Plaintiff demands trial by jury in this action.

### PARTIES

10.     Michael Cruz is a citizen of the United States. He resided at Rikers Island in Bronx County at the time these events occurred. From the time of the June 20, 2014 assault to the time he was finally taken to the hospital for surgery on July 16, 2014, Mr. Cruz was detained at the Anna M. Kross Center ("AMKC"), the Otis Bantum Correctional Center ("OBCC"), and the George R. Vierno Center ("GRVC") at Rikers Island.

11.     Defendant City of New York ("City") is a municipal corporation that, through the DOC, operates a number of detention jails. The DOC, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff, and access to medical and other program services mandated by local law and court orders. In addition, senior officials in the DOC are aware of, and tolerate, certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the DOC, constitute unwritten DOC policies or customs. The DOC is also responsible for the

appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

12.     At all times relevant hereto, Defendant Joseph Ponte was the Commissioner of DOC acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  On information and belief, Ponte, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein. As Commissioner, Ponte was also responsible for the care, custody, and control of all inmates housed in the Department's jails. In addition, at all relevant times, Ponte was responsible for enforcing the rules of DOC, and for ensuring that DOC personnel obeyed the laws of the United States and of the State of New York.

13.     At all times relevant hereto defendant William P. Clemons was the Chief of Department of DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. As Chief of Department, he was the highest-ranking uniformed member of the DOC, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the DOC jails. He was also responsible for the care, custody, and control of all inmates in the DOC jails.

14.     At all times relevant hereto, Defendant Florence Finkle was the Deputy Commissioner of the Department's Investigation Division. As Deputy Commissioner, her responsibilities included supervising the investigation of any and all incidents in which any employee of the Department used force against any inmate, or was alleged to have used force, and recommending Department discipline against staff believed to have violated Department

policies and rules, including those concerning use of force. Defendant Florence Finkle was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails.

15.     At all times relevant hereto, Turhan Gumusdere was the Warden of AMKC within DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. As Warden, he was responsible for the care, custody, and control of all inmates, as well as the supervision of all staff, in AMKC. On information and belief, Defendant Gumusdere was promoted by DOC after serving as a Deputy Warden in the juvenile facility, Robert N. Davoren Center, that was the subject of a report by the United States Department of Justice concerning the use of excessive force by DOC staff.

16.     At all times relevant hereto, Defendant Captain "John" Williams, whose first name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John," was a supervising officer within the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant Williams worked at AMKC on Rikers Island on June 20, 2014.

17.     At all times relevant hereto, Defendant DOC Officer "John" Miller, whose first name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such,

and acting under color of state law. Upon information and belief, Defendant Miller worked at AMKC on Rikers Island on June 20, 2014.

18.     At all times relevant hereto, Defendant DOC Officer "John" Smith, whose first name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant Smith worked at GRVC on Rikers Island on or around July 12, 2014.

19.     At all times relevant hereto, Defendant DOC Officer John Doe # 1, whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #1," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant John Doe # 1 worked at AMKC on Rikers Island on June 20, 2014.

20.     At all times relevant hereto, Defendant DOC Officer John Doe # 2, whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #2," was a DOC officer, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. Upon information and belief, Defendant John Doe # 2 worked at AMKC on Rikers Island on June 20, 2014.

21.     Defendants Williams, Miller, John Doe # 1, and John Doe #2 are collectively referred to as the "Individual Defendants."

22.     Defendants Ponte, Clemons, Finkel, and Gumusdere are collectively referred to as the "Supervisory Defendants."

**STATEMENT OF FACTS**

*New York City's Jails: A History of Abuse*

23.     As of the time Mr. Cruz was beaten, the unwillingness of the Department to investigate adequately and impose meaningful discipline against DOC staff members who use unnecessary and excessive force on prisoners, or who fail to accurately and honestly report it, was widely known and broadly reported. The Supervisory Defendants were well aware of these failures.

24.     For decades, through Department reports and civil litigation, the DOC has been aware of the routine, dangerous and unconstitutional use of excessive force by staff at individual facilities under the control of the DOC.[1]

25.     For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 450 (S.D.N.Y. 2002) (terminating injunction), was a class action that concerned the City's Central Punitive Segregation Unit ("CPSU"). That litigation unearthed evidence of abuse of prisoners and cover-ups that were sufficiently serious to merit criminal prosecution.

26.     *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the pervasive practice of using excessive force against inmates incarcerated in New York City's jails. That litigation revealed significant numbers of credible excessive force complaints by prisoners who had been seriously injured by staff in the City jails. The settlement of that class action was intended to

---

[1]      *See, e.g.*, *Fisher v. Koehler*, 692 F. Supp. 1519 (S.D.N.Y. 1988) (Correctional Institution for Men), *injunction entered*, 718 F. Supp. 1111 (S.D.N.Y. 1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990); *Jackson v. Montemagno*, No. 85 Civ. 2384 (E.D.N.Y.) (Brooklyn House of Detention); *Reynolds v. Ward*, No. 81 Civ. 101 (S.D.N.Y.) (Bellevue Prison Psychiatric Ward).

provide meaningful improvements in the training, practice, and supervision of DOC staff and investigators, and changes in the Department's use of force policy.

27.     In 2011, the City was named as a defendant in *Nunez v. City of New York*, No. 11 Civ. 5845 (S.D.N.Y.), a class action lawsuit that alleges widespread use of excessive force by correction officers at Rikers Island. The operative complaint in that suit once again placed the City on notice that "officers and captains" at Rikers "have inflicted brutal beatings on . . . inmates" and "have lied and coerced false statements to prevent the beatings from coming to light," while supervisors have created and perpetuated "a policy of permitting uniformed staff to use unlawful, excessive force with impunity." Second Am. Compl., *Nunez v. City of N.Y.*, No. 11 Civ. 5845 (S.D.N.Y. Sept. 4, 2012), ECF No. 34 ¶ 1.

28.     The United States Attorney's Office for the Southern District of New York has investigated the problem of excessive force by Department staff on Rikers Island, as have the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, the Bronx District Attorney's Office, and the *New York Times*. Mark G. Peters, Commissioner of the Department of Investigation, condemned the "pattern of lawless conduct at Rikers that must be brought under control." The *New York Times* reported recently, after a months-long investigation, that "brutal attacks by correction officers on inmates" are "common occurrences" at Rikers and observed that "a dearth of whistle-blowers" as well as "reluctance of the city's Department of Correction to acknowledge the problem and the fact that guards are rarely punished" contribute to what the *Times* called a "culture of brutality on the island."

29.     Additionally, through DOC's elaborate reporting system, the Supervisory Defendants were aware of the pattern of a large number of incidents involving the use of

unnecessary and/or excessive force by DOC staff members resulting in serious injuries to inmates but failed to take sufficient steps to curb these abuses.

30.     As of the time Mr. Cruz was beaten, the Supervisory Defendants were aware of the unwillingness of the Department to investigate adequately and impose meaningful discipline against DOC staff members who use unnecessary and excessive force on prisoners, or who fail to accurately and honestly report it.

31.     In fact, since 2002, senior supervisors and uniformed staff in the DOC have been sued repeatedly by inmates alleging staff beatings.  Many of these cases, all resulting in favorable judgments for plaintiffs following settlement, include remarkably similar allegations of misconduct.  *See, e.g.*,

- *Reynolds v. City of New York*, No. 11 Civ. 621 (S.D.N.Y.) (alleging beat-up in George Motchan Detention Center ("GMDC") resulting in shoulder fracture and loss of consciousness; settled for $200,500);

- *Mull v. City of New York*, No. 08 Civ. 8854 (S.D.N.Y.) (alleging beat-up in AMKC resulting in diffuse axonal injury to brain, partial loss of eyesight, and partial loss of hearing, and requiring the victim to take seizure medications; settled for $550,000);

- *Belvett v. City of New York*, No. 09 Civ. 8090 (S.D.N.Y.) (alleging beat-ups at GMDC and Robert N. Davoren Center ("RNDC") resulting in facial fracture; settled for $350,000);

- *Youngblood v. Baldwin*, No. 08 Civ. 5982 (S.D.N.Y.) (alleging beat-up at GRVC resulting in skull laceration and broken nose; settled for $240,000);

- *Williams v. City of New York*, No. 07 Civ. 11055 (S.D.N.Y.) (alleging beat-up in Otis Bantum Correctional Center ("OBCC") resulting in fractured jaw and facial bones and torn earlobe; settled for $202,500);

- *Williams v. City of New York*, No. 09 Civ. 5734 (S.D.N.Y.) (alleging beat-up in RNDC resulting in laceration to head; settled for $87,500);

- *Lee v. Perez*, No. 09 Civ. 3134 (S.D.N.Y.) (alleging beat-up at North Infirmary Command ("NIC") resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);

- *Shuford v. City of New York*, No. 09 Civ. 945 (S.D.N.Y.) (alleging two beat-ups at RNDC resulting in facial fractures; settled for $375,000);

- *Diaz v. City of New York*, No. 08 Civ. 4391 (S.D.N.Y.) (alleging beat-ups involving two inmates, one at AMKC and one at OBCC; settled for $400,000 and $450,000, respectively);

- *Lugo v. City of New York*, No. 08 Civ. 2931 (S.D.N.Y.) (alleging beat-up at NIC resulting in orbital fracture; settled for $185,000);

- *Cuadrado v. City of New York*, No. 07 Civ. 1447 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung; settled for $175,000);

- *Scott v. City of New York*, No. 07 Civ. 3691 (S.D.N.Y.) (alleging beat-up at GMDC resulting in orbital fracture; settled for $175,000);

- *Pischeottola v. City of New York*, No. 06 Civ. 2505 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung requiring chest tube; settled for $150,000);

- *Rice v. N.Y.C. D.O.C.*, No. 03 Civ. 582 (S.D.N.Y.) (alleging beat-ups of two inmates at GRVC resulting in collapsed lung and contusion hematomas in one

case, and in neck and spinal cord injuries causing permanent stutter in the other; settled for $255,000 and $590,000, respectively);

- *Joseph v. N.Y.C. D.O.C.*, No. 02 Civ. 9219 (S.D.N.Y.) (alleging beat-up at GRVC resulting in orbital fracture; settled for $375,000).

32.     On information and belief, the number of incidents in which a use of force has resulted in a Class A injury (an injury requiring medical treatment beyond prescribing over-the-counter analgesics or administering minor first aid) to staff and/or inmates has steadily increased over the last several years. In 2008, there were 88 such incidents reported, followed by 109 incidents in 2009, 128 incidents in 2010, 142 incidents in 2011, and 147 incidents in 2012. According to the *New York Times*, 129 inmates suffered serious injuries in an 11-month period in 2013, and between August 2014 and January 2015, 62 inmates sustained serious injuries at the hands of officers.

33.     Cover-ups are also a part of DOC culture. For example, according to the *New York Times*, DOC's own investigators produced a report in 2012, which concluded that Department staff, including the Warden and Deputy Warden of the RNDC, had participated or been complicit in the intentional falsification of statistics in order to create the false appearance that violence in the jail was declining. The report originally stated that "no legitimate explanation exists for the dramatic and inaccurate decreases in the number of inmate fights," and recommended that RNDC's warden and deputy warden be demoted because they "abdicated responsibility" and "failed to supervise, manage, or oversee the facility's reporting of violence statistics." Instead of demoting them, however, then-DOC Commissioner Dora Schriro ordered that the report be sanitized of any mention of their wrongdoing. The United States Attorney's Office, which was in the midst of investigating violence at the jail, received only the doctored

report. When the cover-up was unearthed, the United States Attorney stated that such a cavalier attitude toward the truth "does not instill confidence in us that the City will quickly meet its constitutional obligations."

34.     The City and the Supervisory Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in the City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

35.     Through all these cases and Department reports, the DOC and the Supervisory Defendants have been made aware of the widespread practice by DOC staff members of using excessive and/or unnecessary force to injure, and not restrain, inmates. They have also been made aware of the failure of DOC's Investigation Division to adequately investigate allegations of misconduct and of the *de facto* refusal of the Department to bring effective disciplinary charges against its officers, to promote institutional reform, and to protect the safety of prisoners confined in DOC custody.

36.     The Department has not taken sufficient steps to curb the abuse that occurs on a daily basis in New York City jails. Rather, it allows that abuse to persist through inadequate investigations of allegations of misconduct and the failure to discipline officers in the face of obvious wrongdoing.

**The June 20, 2014 Assault**

37.     On June 20, 2014, Mr. Cruz was incarcerated in the AMKC at Rikers Island.

38.     At the time, Mr. Cruz was 20 years old. He was a resident of the Bronx, New York, and had graduated from Martin De Porres High School in Queens.

39.     Mr. Cruz had a history of mental health problems and had previously received both in- and out-patient mental health treatment.

40.     In the days leading up to June 20, 2014, Mr. Cruz had verbal disputes with correction officers over his housing and other matters. As a result, officers told Mr. Cruz on June 20, 2014 that he was going to be taken to punitive segregation, where he would be held in solitary confinement.

41.     Mr. Cruz asked DOC officers for a mental health evaluation prior to being placed in solitary confinement.

42.     Appearing to comply with this request, Defendants Williams, Miller, and John Doe # 1 escorted Mr. Cruz to the mental health clinic. Once they arrived in the waiting area, Defendant Williams, a captain, told Mr. Cruz to stay where he was while he went to find a clinician. Mr. Cruz complied, remaining with Defendants Miller and John Doe #1, as well as John Doe #2, who was already at the clinic.

43.     As they waited, Mr. Cruz grew fearful of an assault. He noticed that there were no cameras or other witnesses nearby. He also saw Defendant Miller loosen his collar and roll up his sleeves. Mr. Cruz, who usually keeps his shoes untied, quickly tied his shoes, in case he needed to flee from an attack.

44.     At that moment, Defendant Miller struck Mr. Cruz on his jaw, and all three officers began beating Mr. Cruz.

45.     The officers repeatedly kicked and punched Mr. Cruz.

46.     He received multiple punches and kicks to his stomach, back, ribs, head, and face. The officers also stomped on his hand.

47.     During the attack, Mr. Cruz did not fight back or resist.

13

48.     Mr. Cruz covered his face and crouched against the wall, attempting to defend himself from the blows.

49.     The punches and kicks from Defendants Miller and John Does #1 and #2 did not stop until Defendant Williams returned, saying, in sum and substance, "Alright, that's enough." Mr. Cruz then returned to his feet. Defendant Williams stated, in sum and substance: "See what you did?"

50.     Mr. Cruz was then placed in the holding pen in the mental health clinic—where he should have been taken originally. While there, he overheard the officers laughing about the assault. One officer said, in sum and substance, "I told you guys Miller was a ticking time bomb."

51.     After 20 minutes, Mr. Cruz was evaluated by a medical clinician, who noted that Mr. Cruz had swelling and bruising on his scalp, neck, head, forehead, and back.

52.     Mr. Cruz was then sent to Elmhurst Hospital. There, x-rays revealed that the officers had broken several of Mr. Cruz's ribs. He stayed at the hospital overnight, and was discharged in the early morning of June 21.

*The Emergency Spleen Surgery*

53.     In the weeks following the assault, Mr. Cruz continued to suffer extreme pain and discomfort.

54.     He complained of a pain in his chest and a disconcerting feeling in his abdomen that he described as feeling like his organs were bleeding.

55.     On July 14, 2014, Mr. Cruz repeatedly complained about his severe pain to Defendant Smith, who was on a steady shift that day. Defendant Smith refused to take Mr. Cruz to the clinic. Mr. Cruz even urinated in a cup to show Defendant Smith that there was blood

in his urine. Still, Defendant Smith ignored his suffering and refused to allow Mr. Cruz to seek medical attention.

56.     Finally, when Defendant Smith's shift ended around 11:00 p.m., Mr. Cruz was able to convince another officer to take him to the clinic.

57.     The clinic ordered blood tests for Mr. Cruz that night, July 14, 2014.

58.     The results, which came back on July 16, 2014, revealed that Mr. Cruz had a startlingly low hemoglobin count.

59.     Where the average hemoglobin count is around 14 to 18 grams per deciliter, Mr. Cruz's was 6.8. The clinic doctor informed Mr. Cruz that this low hemoglobin count was consistent with internal bleeding, and sent him to Elmhurst Hospital for further treatment.

60.     At Elmhurst, a CT scan revealed that Mr. Cruz's stomach was filling with blood and that his spleen had multiple lacerations, requiring immediate surgery.

61.     The Elmhurst records note that Mr. Cruz "likely developed internal bleeding from previous injury," referring to the June 20 assault.

62.     Within a few hours of arriving at Elmhurst, Mr. Cruz underwent surgery that ultimately removed his spleen.

63.     After the operation, Mr. Cruz was told that three liters of blood had been removed from his stomach, and that had he been left in his cell much longer, the internal bleeding would have proved fatal.

64.     Mr. Cruz remained at Elmhurst for six days while he recovered from the surgery. He was discharged on or around July 21, 2014.

*Mr. Cruz's Substantial Permanent Injuries*

65.     The spleen is central to the body's immune system and helps it fight infection. Because his spleen was removed, Mr. Cruz will be required to receive multiple vaccines every five years to stave off infectious diseases.

66.     Mr. Cruz is also at higher risk of infection because he does not have a spleen.

67.     Even a common ailment like a cold could leave him incapacitated. He was instructed by Elmhurst Hospital to seek medical attention even for minor illnesses such as sinus problems or colds.

68.     The surgery left Mr. Cruz with a large scar, approximately seven inches long, on his abdomen.

69.     To this day, Mr. Cruz remains sore from the surgery. He feels discomfort and tenderness every time he gets out of bed.

70.     This discomfort and tenderness has also prevented him from exercising. Prior to the assault and the surgery, Mr. Cruz enjoyed lifting weights. He can no longer lift weights without experiencing significant pain.

71.     Mr. Cruz was also placed on blood pressure medication directly following his surgery.

72.     Within ninety days after the June 20, 2014 assault, a written Notice of Claim, sworn by Plaintiff, was served upon Defendants at the Comptroller's Office at 1 Centre Street, New York, New York.

73.     At least thirty days have elapsed since the service of the Notice of Claim and adjustment or payment of the claim has been neglected or refused.

74.     This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Fourth and Fourteenth Amendments Excessive Force**
**(Against All Individual Defendants and Supervisory Defendants)**

75.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

76.     By reason of the foregoing, by assaulting, battering and using gratuitous, excessive, brutal, sadistic, and unconscionable force on Mr. Cruz, and by failing to prevent other defendants from doing so, and by failing to provide medical attention to Mr. Cruz when it was obvious that he needed urgent medical care, the Individual Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution to be free from gratuitous and excessive force.

77.     The Individual Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment as DOC officers and employees. Said acts by the Individual Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. The Individual Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

78.     The Supervisory Defendants knew that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assaults on Plaintiff. Their failure to take measures to curb this pattern of brutality constitutes acquiescence

17

in the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence at the time of Plaintiff's beatings, and the failure of the Supervisory Defendants to take remedial action despite the fact that the misuse of force in City jails had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Plaintiff. The Supervisory Defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

79.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Fourteenth Amendment Excessive Force**
**(Against Defendant City)**

80.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

81.     Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern and practice of staff brutality by DOC staff at the time of Plaintiff's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice, or custom and led to Plaintiff's assault.

82.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice and custom pursuant to which Plaintiff was subjected to a brutal beating, Defendant City has deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, the right to be free from gratuitous and excessive force guaranteed by the Fourteenth Amendment to the United States Constitution.

18

83.     As a direct and proximate result of the policy, practice, and custom detailed above, Plaintiff sustained the damages hereinbefore alleged.

### THIRD CLAIM FOR RELIEF
**Assault**
**(Against Defendants City, Miller, Doe #1, and Doe #2)**

84.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

85.     By reason of the foregoing, and by threateningly approaching Plaintiff and aiming to strike and kick him, Defendants Miller, Doe #1, and Doe #2, acting in their capacities as DOC officers and employees, and within the scope of their employment as such, intentionally placed Plaintiff in apprehension of imminent offensive contact, and displayed the ability to effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

86.     The assault committed by Defendants Miller, Doe #1, and Doe #2 was unnecessary and unwarranted in the performance of their duties as DOC officers and employees, and constituted unreasonable and excessive uses of force.

87.     Defendant City, as employer of Defendants Miller, Doe #1, and Doe #2, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

88.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**FOURTH CLAIM FOR RELIEF**
**Battery**
**(Against Defendants City, Miller, Doe #1, and Doe #2)**

89.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

90.     By reason of the foregoing, and by intentionally punching and kicking Plaintiff, Defendants Miller, Doe #1, and Doe #2, acting in their capacities as DOC officers and employees, and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

91.     The battery committed by Defendants Miller, Doe #1, and Doe #2 was unnecessary and unwarranted in the performance of their duties as DOC officers and employees, and constituted unreasonable and excessive uses of force.

92.     Defendant City, as employer of Defendants Miller, Doe #1, and Doe #2 , is responsible for their wrongdoing under the doctrine of *respondeat superior*.

93.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**FIFTH CLAIM FOR RELIEF**
**Negligent Hiring/Training/Discipline/Retention of Employment Services**
**(Against Defendant City)**

94.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

95.     Defendant City, through the DOC, owed a duty of care to Plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to Plaintiff or to those in a like situation would probably result from the foregoing conduct.

20

96.     Upon information and belief, all of the Individual Defendants were unfit and incompetent for their positions.

97.     Upon information and belief, Defendant City knew or should have known through the exercise of reasonable diligence that the Individual Defendants were potentially dangerous.

98.     Upon information and belief, Defendant City's negligence in screening, hiring, training, disciplining, and retaining the Individual Defendants proximately caused each of Plaintiff's injuries.

99.     As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

**SIXTH CLAIM FOR RELIEF**
**Negligent Failure to Provide Medical Treatment**
**(Against Defendant City and Defendant "John" Smith)**

100.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

101.    Defendant Officer "John" Smith owed a duty of care to Mr. Cruz to provide him with access to medical treatment after he had been assaulted and while he was in the custody and care of the DOC, because under the same or similar circumstances, a reasonable, prudent and careful person should have anticipated that injury to Mr. Cruz or to those in a like situation would probably result from the failure to provide access to immediate medical treatment.

102.    Defendant Officer Smith allowed Mr. Cruz remain in his cell, despite constant complaints of pain and evidence of bloody urine, without providing him any medical treatment and without taking him to a doctor.

103.     Defendant Officer Smith knew, or should have known, that his failure to provide medical treatment to Mr. Cruz, or to take him to a doctor, for an extended period of time could and did exacerbate and worsen Mr. Cruz's condition, causing him severe injury.

104.     Defendant City, as employer of Defendant Officer Smith, is responsible for his wrongdoing under the doctrine of *respondeat superior*.

105.     As a direct and proximate result of the misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

A.      Compensatory damages in an amount to be determined at trial for the physical and psychological injuries sustained by Mr. Cruz as a result of the events alleged herein.

B.      Punitive damages against the Individual Defendants and Supervisory Defendants in an amount to be determined at trial.

C.      An order awarding Plaintiff reasonable attorneys' fees, together with the costs of this action.

D.      Such other and further relief as the Court may deem appropriate.

Dated: June 19, 2015
       New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

Jonathan S. Abady
Samuel Shapiro
Alison Frick
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

THE LEGAL AID SOCIETY
Jonathan S. Chasan
Mary Lynne Werlwas
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530

*Attorneys for Plaintiff*